Statement of the Case.
NICHOLLS, J.
The plaintiff averred that the defendants, a. commercial firm, were indebted to him in the sum of $3,200; that on the 11th day of December, 1902, 183 bags of sugar (lots 16 and 17) were shipped from the *813 Magnolia Plantation, on the New Orleans, Ft. Jackson & Grand Isle Railroad, to the said Harry L. Laws & Co., consigned upon a bill of lading in petitioner’s name and for petitioner’s account; that the said Harry L. Laws & Co. were to sell this specific lot of sugar for petitioner’s account; that they did so sell for a price and sum of $13.50 a bag, or at least $2,470.50, and have refused to at-torn to or pay the said amount of $2,470.50 to petitioner; that on the 10th day of December, 1902, 327 barrels of sugar (lots 12, 13, 14, and 15) were shipped from the same place to and by the same parties, and in the same manner and for the same purpose and account, and, though the said Harry L. Laws & Co. have sold said sugar for an amount exceeding $4,000 net, they have kept back and refused to pay a portion of said proceeds of sale to petitioner, the amount of $730, though payment of same has been duly demanded of them; that petitioner reserved the right to sue for any further later shipments of sugar made in the same manner of which he has now no knowledge.
Defendants answered. After pleading a general denial, they averred that on or about the 15th of February, 1902, plaintiff entered into a contract with the Magnolia Sugar & Railroad Company, whereby the plaintiff agreed to lend to the said company the sum of $86,400 for the purpose of working its plantations during the year 1902, and in evidence of the said loan the said company gave to the said plaintiff its promissory note for that amount.
That it was stipulated and contracted in said agreement that, in order to' secure the payment of said note to the said Norwood, said company granted a first lien and privilege on the crop of sugar and molasses to be raised by it on certain plantations therein named; agreeing further “to ship to New Orleans, for account of the said Norwood, to such responsible party as would be acceptable to both parties to that contract, a sufficient amount of said crop to pay off said note; agreeing to devote the entire shipments, commencing with the first made from the proceeds of the crops of sugar cane on said plantations — after the payment of which note the lien agreements therein entered into should be null, void, and of no further effect,” etc.
Now, in furtherance of said stipulation to ship enough of said crop to some responsible party to pay said note of $86,400, the said Magnolia Sugar & Railroad Company on the 21st of October, 1902, addressed to respondents the following communication:
“I owe Mr. W. H. Norwood eighty-six thousand four hundred dollars, and the first sugar shipped is pledged to him. for its payment. You will, therefore, in accordance with his directions, deposit the proceeds of each shipment, as it is collected, to his credit in the Hibernia Bank and Trust Company of New Orleans.”
And respondents averred that on the 22d of October, 1902, they replied to his letter as follows:
“We are in receipt of your letter of October 21st. advising that you owe W. H. Norwood Eighty-six thousand Four Hundred Dollars, and the first sugar shipped by your Company is pledged to him for its payment; and instructing us, in accordance with his directions, to deposit the proceeds of each shipment as collected, to Norwood’s credit in the Hibernia Bank and Trust Company, which will be complied with.”
Respondents further averred that on the same date, October 22, 1902, they addressed to the said Magnolia Sugar & Railroad Company the following letter:
“Referring to our letter of even date, and supplement thereto, in reply to yours of October 21st, relative to your indebtedness to W. H. Norwood, and instructing as to the disposition of the proceeds of your first shipments, we wish it to be clearly and distinctly understood that the amount due by you to James II. Laws & Co., in round figures about Sixteen Thousand Dollars, is to be paid as soon as possible from sales of your sugars, and the whole amount entirely liquidated during the shipping season.”
To which said Magnolia Sugar & Railroad Company replied on the 23d of October, to respondents, as follows:
“I have your favor of the 22d inst. in which you say that ‘We want it to be clearly and dis *815 tinctly understood that the amount due by you to James I-I. Laws & Co., in round figures about Sixteen Thousand Dollars, is to be paid, as ■soon as possible, from sales of your sugars, and the whole amount entirely liquidated during the shipping season.’ In reply, I beg to say that this was the understanding when you so kindly made the loan of the Fifteen Thousand Dollars.
“It will take about 3,000,000 pounds of sugar to pay both you and Norwood, and as we expect 6,000,000 pounds, we do not think that you need feel any special anxiety on the subject.”
Respondents further averred that, in conformity with the said contract and agreement, the said Magnolia Sugar & Railroad Company shipped and consigned to respondents between the 3d of November and the 11th of December, 1902, some 6,867 packages of sugar, which were received by them, and sold at sundry times for the price of $88,-078.13, and that respondents remitted and paid to W. H. Norwood at sundry times between the 10th of November and the 16th of December said sum of $86,400, whereby the indebtedness to him of the said Magnolia Sugar & Railroad Company was fully paid, and the lien granted in the aforesaid contract became null and void and of no ■effect. All of which will more fully appear by two statements or memoranda of shipments, marked “DIO” and “Dll,” hereto annexed. And respondents further averred that the remaining $2,178.13 of proceeds of said sale were, in conformity with the instructions of the said Magnolia Sugar & Railroad Company, by respondents paid to James H. Laws & Co. on account of the privileged indebtedness of said Magnolia Sugar & Railroad Company to them for advances made upon said crop, of approximately $16,-000.
And respondents averred that they had ■discharged all and singular the obligation and obligations by them undertaken towards the said plaintiff, as was evidenced by the foregoing correspondence and agreements, and that they owe to the said plaintiff no accounting for the said transaction, and no sum of money whatsoever..
The district court rendered judgment in favor of the defendants, and plaintiff appealed.
Opinion.
The evidence adduced on the trial of this case sustained the allegations of defendants’ answer, except as to the fact that the whole of the $16,000 due to James H. Laws & Co. was a privilege claim upon the crop of 1902. The greater portion of that amount was for money which had been furnished by James H. Laws & Co., of Cincinnati, to the Magnolia Sugar & Railroad Company, the year previous (1902). There was, however, a portion of that amount which was seemed by privilege on the crop of 1902. The only engagement entered into by H. L. Laws & Co. in the premises, concerning the payment of a debt due to the plaintiff by the Magnolia Sugar & Railroad Company, was one with respect to the debt of $86,400, which arose from the loan made by the plaintiff to the Magnolia Sugar Company under the act of 18th of February, 1902; and that engagement was limited to receiving shipments of sugar from the company, selling the same, and depositing the proceeds of the same, to the extent of the $86,400, for account of the plaintiff, in the Hibernia Bank & Trust Company. The defendants complied with that agreement. They deposited to the credit of the plaintiff, in the Hibernia Bank & Trust Company, $86,400, the proceeds of sugar consigned to him by the Magnolia Company. After this dex>osit was made, the defendant had no control over that fund, and did, in point of fact, control it in no manner. Plaintiff alone controlled it, and withdrew it from the bank.
Under the facts as so stated, it would appear that defendants had fully complied with all their obligations to plaintiff under their agreement, but he contends that they have not done so. To understand the basis of this claim, we have to go beyond plaintiff’s pleadings and examine the evidence intro *817 dueed on the trial. It will he seen that plaintiff did not, in his petition, obtain from the defendants an accounting for all of the shipments of sugar made to them by the Magnolia Company, but claimed a direct liability by them to him on certain specific ■shipments alleged to hare been consigned to them on the 10th and 11th of December, 1902, from the Magnolia Company, upon bills of lading in his name and for his account.
It appears that, after the defendants had ■entered into their above-mentioned agreement, it was realized that the Magnolia Company would need money to pay the expenses of taking off and manufacturing its crop of 1902. In order to do so, Gov. War-moth, the president of the company, applied to the plaintiff to furnish money needed, which the latter consented to do. This agreement he carried out by drawing checks in favor of the company to the extent of $32,000 upon the fund deposited to his credit in the bank, and his contention is that, by reason of this advance of money for the purpose stated, the debt due to himself, of $86,-400, was not paid through the deposit made by the defendants to that amount to his credit in the Hibernia Bank, as the proceeds of the shipments of sugar received by the defendants had to he first imputed to the payment of these advances for expenses. He claims that this was a matter understood and agreed to between himself, Gov. Warmoth, and .also the defendants; that in fact this understanding was the result of a suggestion made to that very effect by Mr. Levy himself, the agent and business man of H. L. Laws & Co. in New Orleans. The evidence fails to establish any such agreement by H. L. Laws & Co. Levy did, in a conversation, refer to the situation in which the Magnolia Company would be left by the application of the proceeds of the first shipments, in their entirety, to the payment of the note of $86,400, and did state that it was customary for planters to have a certain amount per barrel retained to apply to the payment of the “rolling” expenses, but plaintiff’s own testimony shows that he refused to entertain any such proposition. Such arrangements and agreements as were after-wards made in reference to the payment of these expenses were between the plaintiff and the Governor alone.
Gov. Warmoth testified in the ease that he had, on the plantation, suggested to Mr. Nor-wood that he should give him a letter to Mr. Levy, authorizing him to furnish him (War-moth) money as he would need it, but Mr. Norwood preferred that the money should be paid to his bank, and that any money which he should get afterwards should come from him directly, and not from Mr. Levy. Witness had never given H. L. Laws & Co. any instructions concerning the deposit of any further sum than the $86,400. He had received from defendants the account sales of the sugar shipped to them. They were very satisfactory to him. He had received a statement showing the disposition of the shipments of sugar. It was very satisfactory. He would say it was entirely satisfactory. The witness’ attention being called by defendants’ attorney to the fact that by that statement there was a balance over the $86,-400 of $2,178.13, he said that he had not noticed that in the statement. Witness, being then told it was the difference between the two sums, answered he had only noticed it for $86,400; that it was the difference between the debit side and credit side of $2,178; that the Magnolia Company was givm credit for that in its accounts with James 3. Laws & Co.
Defendants’ counsel, after stating to the witness that after H. L. Laws & Co. had received a sufficient quantity of sugar to enable them out of the proceeds of this sugar to pay into the Hibernia Bank & Trust Company $86,400, as authorized under his contract with Mr. Norwood, asked him whether he did not consider they had discharged their *819 full obligation to witness under his contract with Mr. Norwood, to which question witness answered, “That was the position they assumed in the letter which he received from Mr. Levy.” He was then asked: “Did you acquiesce in that interpretation?” To which he answered, “Yes;” that his understanding was that Laws should be paid, as he insisted on it. Witness tried to get him to carry it over, but he wouldn’t do it. H. L. Laws & Co. paid Mr. Norwood $86,400. Witness thought they had a right to receive the twenty-one hundred and odd dollars.
The following admissions were made on the trial:
“It is admitted that the six thousand eight hundred and sixty-seven bags and barrels of sugar, as shown in Document Dll, to be hereafter offered by defendant, were shipped by the Magnolia Sugar & Railroad Company to Harry L. Laws & Co.; the bills of lading therefor reading for account of W. H. Norwood.
“It is admitted that the proceeds of the sale of the 6,867 bags of sugar shipped as set out in Document Dll were sold by Harry L. Laws & Co., and that the entire proceeds of sale thereof exceeded the $86,400 pledged to William II. Norwood by the sum of $2,178.13, which sum of $2,178.13 was by Harry L. Laws & Co. paid to james II. Laws & Co. on account of the alleged lien and privilege of the latter upon said crop, and under and by virtue of the instructions of the said Magnolia Sugar & Railroad Company, as set out in the correspondence to be hereafter offered, as claimed.”
On. the 16th of December, 1902, the defendants, per pro. Lewis F. Levy, wrote the following letter to the plaintiff:
“We beg to notify you that in conformity with the written instructions of Gov. H. C. Warmoth, President of the Magnolia Sugar & R. R. Co. dated October 21st, 1902, we have deposited to your credit in the Hibernia Bank & Trust Co., of New Orleans proceeds of all shipments of sugar received to date from the Magnolia Sugar & R. R. Co., for your account amounting to Eighty thousand three hundred and ninety two and "7ioo dollars ($80,392.96), leaving a balance due you under said War-moth’s instructions of six thousand and seven and Vioo Dollars ($6,007.04). While we have not sold sufficient sugar to pay this balance, we have bills of lading covering shipments, which it is reasonably supposed will be sufficient to meet this balance, and in order to avoid complications we have this day deposited to your credit in the Hibernia Bank & Trust Company of New Orleans the balance of $6,007.04, which with the sums previously deposited aggregate eighty-six thousand four hundred dollars ($86,400.00) total amount covered by aforesaid written instructions of Gov. H. C. Warmoth, President Magnolia Sugar R. R. Co. dated October 21st, 1902.”
On the same day defendants, per pro. Lewis F. Levy, wrote the following letter to Gov. H. C. Warmoth, as president of the Magnolia Sugar & Railroad Company:
“We to-day deposited in Hibernia Bank & Trust Co. of New Orleans, to the credit of W. H. Norwood $6,007.04, which with the sum previously deposited advised to you under different dates, aggregate $86,400.00, the total amount we were to deposit for this account in accordance with instructions contained in your letter to us of October 21st, 1902.
“Yours Truly,
“[Signed] Harry L. Laws & Co.
“per pro. Lewis F. Levy.”
On the 19th of December, 1902, the plaintiff, per James W. Wilkinson and McCloskey & Benedict, attorneys, wrote the following-letter to the defendants:
“Gentlemen: I beg leave to acknowledge receipt of your letter of December 6th, 1902, but cannot agree with you that the $86,400 which you claim to have deposited for my account in any wise covers the amount due, as a large-amount of this $86,400, was returned by me to-Gov. Warmoth, as per our mutual agreement made between Gov. Warmoth, your representative, Mr. Levy, and myself, leaving a large balance due me on my note.
“I respectfully request an accounting of all', the sugars shipped by the Magnolia Sugar & R. R. Co., for my account and in my name, which you have sold as broker. I further request and' demand that the total amount of the net proceeds of said sugar be forthwith paid to me,, leaving my right to recover from the Receiver any balance which may be due me on my aforesaid note due by the Magnolia Sugar & R. R. Co.
“Awaiting an early reply, I remain,
“Very respectfully,
“W. H. Norwood,
“per Jas. Wilkinson
&
“McCloskey & Benedict,
“Attorneys.”
Plaintiff urges that even though the defendants may not have entered into an agreement with himself increasing their obligations beyond those which they assumed originally, to deposit $86,400 to his credit, and upon the performance of Which they would have stood discharged from all liabií *821 ity or responsibility to him, yet, having received, in point of fact, and without objection, shipments made to them under bills of lading reading “For account of W. H. Nor-wood,” they were estopped from doing afterwards any act which would inure to their own benefit, or others for whom they were agents, which would conflict with the instructions under which they received the sugar, and to the prejudice of the party for whose benefit the shipments, under the terms of the bills of lading, were made. The proposition on which that contention rests might be conceded to be correct as governing many cases, but we do not think that it applies in this case, for several reasons. In the first place, the bills of lading were not made by the shipper to read as they did with the intention on his part of widening or broadening the obligations of Laws & Co. beyond what they were originally, either towards the sugar company or towards plaintiff, or with the intention of increasing plaintiff’s rights beyond what they were originally. The precise quantity needed to be shipped to defendants in order to cover the sum of $86,400 was a matter of uncertainty. The sale of the sugar could alone determine what would be necessary in the premises. It was not the intention, in point of fact, of the shippers that defendants should continue to make deposit proceeds in the Hibernia Bank over and above the amount of $86,400 to the credit of the plaintiff. There would be no violation of defendants’ duty to the shippers in stopping making deposits when the limit of $86,400 agreed upon had been reached, and especially when plaintiffs had not been advised of, and knew nothing of the nature of, the last bills of lading. The shippers had the right, under the circumstances of this case, to have countermanded instructions, even if given by them designedly to the consignee at the time of shipment as to the future disposition of the funds, without a right on the part of the plaintiffs to have complained of their change of mind. The sugar in the hands of the defendants was the property of the sugar company, and it had a right of control over it and the proceeds. It is very evident that, under the testimony, it was not the intention of 'the consignees to make the shipments inure to the benefit of the plaintiff for any amount over $86,400, and that therefore defendants had the right to apply the surplus of the proceeds of the sugar beyond $86,400 to a partial payment of the debt due to James H. Laws & Co., as had been agreed on. So far from objecting to this latter imputation of proceeds as being a violation of instructions, the sugar company expressly approves and acquiesces in it. We see nothing in the situation of parties which would authorize the plaintiff to break the force of this approval and acquiescence, and the carrying out of the actual and real intentions of the shippers.
There are several circumstances disclosed by the testimony which fortify us in the views we have reached in this matter, but we see no necessity for dwelling on them or discussing them, as, independently of them, we think the case is with the defendants, and the judgment of the district court is correct. That judgment is therefore affirmed.